## Case No. 3,676.

### DAY v. CANDEE et al.

[3 Fish. Pat. Cas. 9.][1]

Circuit Court, D. Connecticut. Sept. Term, 1853.

PATENTS—ASSIGNMENT AND LICENSE — CONTRACT TO CONVEY PROSPECTIVE EXTENDED TERM — POWER OF ATTORNEY — REVOCATION OF CONTRACT—INJUNCTIONS.

1. A patentee can not convey an extended patent before the extension. He may, however, agree, upon a valuable consideration, to convey such right whenever it shall be vested in him. This was the effect of the agreement between Chaffee and Goodyear, dated May 23, 1850.

2. A court of equity will protect the equitable rights of defendants, although the complainant is the owner of the legal title.

3. A power of attorney, which gives to the agent a veto upon the acts of his principal, is equivalent to a power coupled with an interest.

4. A power of attorney, which provides that the patent shall inure to the benefit of others, is, in equity at least, equivalent to a formal assignment, and is not revocable. Such a power of attorney is coupled with an interest.

5. The patent could not inure to the benefit of the licensees unless either a legal or an equitable right was transferred.

6. If a beneficial equitable interest vested in Judson and the licensees of Goodyear under the contract of September 3. 1850, they could not be divested in equity of that interest by the temporary withholding of the quarterly payments provided for in that agreement.

7. The consideration for the contract was the agreement to pay, and not the actual payment. A failure to pay would not therefore authorize the revocation of the contract.

8. Where by granting an injunction there would be a greater probability of producing incalculable mischief than there would be of preventing it, neither an absolute nor conditional injunction ought to be granted.

[Cited in Southwestern Brush Electric Light & Power Co. v. Louisiana Electric Light Co., 45 Fed. 896.]

In equity. This was a motion for a preliminary injunction to restrain the defendants from infringing letters patent for "improvement in the process and machinery for the manufacture of India rubber," granted to Edwin M. Chaffee, August 31, 1836, extended for seven years from August 31, 1850, and, as was claimed, assigned to the complainant July 1, 1853. The defendants were licensees of Charles Goodyear, who claimed the right to use, and to license others to use, the invention of Chaffee during the original and extended terms of the patent, under two contracts dated respectively May 23. 1850, and September 5, 1850. These contracts and a supplementary agreement between Chaffee and William Judson, who acted as the attorney in fact of Goodyear, are given below, and, with the statement of facts in the opinion, sufficiently set forth the questions involved in the controversy.

Agreement of May 23, 1850:

"This agreement, made by and between Edwin M. Chaffee and Charles Goodyear, witnesseth, that the said Chaffee, for and in consideration of the sum of three thousand dollars, to be paid to him, as hereinafter specified, hath sold, assigned, and set over, and by these presents doth hereby assign and transfer all his right, title, and interest in and to the improvement or invention of compounding and mixing gum lac or shellac with India rubber, either with or without sulphur or other ingredients, and heat. And the said Chaffee further agrees to apply, either with or in behalf of said Goodyear, for patents in the United States for said invention, at the expense of said Goodyear; said Chaffee further agrees, that said Goodyear may proceed to take out patents in all foreign countries, for his said Goodyear's benefit, said Goodyear paying the expenses of the same for said improvements in shellac, and said Chaffee agreeing to execute the necessary papers therefor. The said Goodyear, on his part, agrees to pay to the said Chaffee the sum of three thousand dollars, upon the following terms, viz.: one-half of the aforesaid sum, or fifteen hundred dollars, at the time of the issuing of a patent for said improvements in the United States, or if a patent should be previously granted as a renewal of his, said Chaffee's patent, for India-rubber machinery, then the aforesaid sum of fifteen hundred dollars shall be paid to the said Chaffee upon the assignment of said patent for said machinery to said Goodyear, the remaining one-half of said three thousand dollars to be paid within one year from the date hereof. In the event of neither of the aforesaid patents being obtained, then the first-named sum of fifteen hundred dollars is also to be paid within one year from the date hereof. And said Chaffee, upon his part, agrees further, that upon the issuing of one or both of the aforesaid patents for shellac and machinery, he will immediately assign them to the said Goodyear. And it is further mutually agreed, that if at that time the aforesaid three thousand dollars shall not have been paid, the said Goodyear shall make such a lien, transfer, or conveyance of his right, title, and interest in said patent to said Chaffee, as shall prevent any valid transfer of any rights or interests in said patents by the said Goodyear, until the said three thousand dollars shall be paid by the said Goodyear. It is further understood, that said Chaffee may reserve to himself the right to use the said India-rubber machinery in any business which he may hereafter carry on; and it is further understood, that if the said patent for India rubber machinery is not extended, then the whole sum of three thousand dollars shall be paid for, or secured upon, the patent and improvement for shellac. In witness whereof, we have hereunto set our hand and seals, this 23d day of May, A. D. 1850.

"Edwin M. Chaffee.   [L. S.]
"Charles Goodyear.   [L. S.]
"Witness: James A. Dorr."

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

Agreement of September 5, 1850:

"Whereas, I, Edwin M. Chaffee, have lately procured an extension of my patent, dated August 31, 1836, from seven years from the expiration thereof, the expenses of which have been large, by reason of the opposition thereto—but which expenses have not yet been ascertained, and cannot be at present; and whereas, said patent, at the time it was extended, stood in the name of Charles Goodyear, and was held for his benefit, and the benefit of those who had a license, or who had a right to use his metallic or vulcanized India rubber, or India rubber prepared and cured according to and under his patent, dated June 15, 1844, and reissued December 25, 1849; and whereas, said Charles Goodyear agreed with me, for himself and others using my said patent under him, that they would be at the expense of applying for said extension of said patent, and make me an allowance for the use thereof, in case the same should be extended, at and after the rate of twelve hundred dollars per annum, to commence on the 31st of August, 1850, and payable quarterly, that is to say, three hundred dollars on the first day of December, March, June, and September in each and every year during the present or any further extension of said patent, and during any reissue of the same, and until said patent or any reissue thereof shall be set aside as void in the highest court to which the same can be carried; and whereas, William Judson, Esq., has had the management of said application for said extension, and has paid and become liable to pay the expenses thereof, and agreed to guarantee me the payment of said sums of money, according to the terms, and at the times above specified: Now I do hereby, in consideration of the premises, and to place my patent so that in case of my death or other accident or event, it may inure to the benefit of said Charles Goodyear and those who hold a right to the use of said patent, under and in connection with his licensees, according to the understanding of the parties interested, nominate, constitute, and appoint said Wm. Judson, my trustee and attorney irrevocable, to hold said patent and have the control thereof, so that no one shall have a license to use said patent or invention, or the improvements secured thereby, other than those who had a right to use the same when said patent was extended, without the written consent of said Judson first had and obtained. And the said Judson, for himself and those interested, agrees with me, said Chaffee, my executors, administrators, and assigns, that the expenses of extending said patent, shall all be paid without charge to me; and further, that I shall be paid said sums of money, at the times and according to the terms above recited; and said Judson, and those for whom he acts, are to be at all the expenses of sustaining and defending said patent, without any charge to me. And it is further expressly understood and agreed, that I am to have the right to use said patent and improvement in any business which I may carry on. As witness my hand and seal, this 5th day of September, 1850.

"Edwin M. Chaffee. [L. S.]
"Witness: Geo. Woodman."

Agreement of November 12, 1851:

"Whereas, it was agreed by and between William Judson and E. M. Chaffee, by an article under hand and seal, and dated the 5th day of September, 1850, which agreement was recorded at the patent office, September 11, 1850, on what terms said Chaffee would continue to hold said patent for the benefit of said Judson and Charles Goodyear, and his licensees; and whereas, in said agreement there was an omission to state that if said licensees continued to use the improvements in said patent named, they should each one contribute and pay said Judson his proportion of the expenses and services expended in obtaining the renewal of said patent, which it was intended that said licensees should pay under said Judson, in case they continued the use of said improvements for which said patent was issued, after the extension thereof; and whereas, there was no such direct, absolute stipulation, on the part of said Judson, to pay said Chaffee the sum of fifteen hundred dollars per annum, in quarterly payments, on the usual quarter days, as said Chaffee claimed, and now insists shall be inserted in said agreement; and whereas, it is now agreed by said Chaffee and said Judson, that said agreement shall be so modified as to secure the objects more fully intended to be secured by said agreement: Now it is agreed, that said licensees shall each pay his share of the services and expenses to said Judson, as the condition on which they shall have the license of said Judson to use said improvements; and that on the payment of his or their share or proportion of the services and expenses aforesaid, said Judson shall be authorized to give each a license to use said improvement, on their paying as aforesaid, severally, each for himself, or his firm, or company. And said agreement is further so altered, that said Judson hereby agrees to pay said Chaffee fifteen hundred dollars, in quarterly payments each year, on the usual and customary quarter days, on the time set forth in the agreement aforesaid, to which this is an addition and alteration, commencing the quarterly payments on the first day of March next. And I agree with said Judson that he may use my name in the commencement and prosecution of all suits he may have occasion to commence to sustain said patent, or recover damages for any infringement or infringements thereof, or for any other purpose in relation to the same, or the use thereof, he holding me harmless from any costs by reason thereof, and he to have all the benefits which may be derived from such suits. Sealed and delivered this 12th day of November, 1851, in the presence of

"William Judson. [L. S.]

"The word 'February' erased, and the word 'March' inserted before execution.

　　　　　"Edwin M. Chaffee. [L. S.]
　　"Benjamin H. Jarvis.

."Received and recorded November 27, 1851."

C. R. Ingersoll and N. Richardson, for complainant.

R. D. Hubbard and R. S. Baldwin, for defendants.

INGERSOLL, District Judge. The complainant, claiming to have, by assignment from Edwin M. Chaffee, the exclusive right to the extended patent originally granted to Chaffee, August 31, 1836, for grinding India rubber without a solvent, and extended to him for seven years from August 31, 1850, and that the defendants are using the thing patented without any license or lawful right, has brought his bill in equity to this court in which he seeks the interposition of the court to restrain and enjoin the defendants against the further use of the invention thus secured to Chaffee and his assigns by such extended patent.

In the bill, the complainant, among other things, alleges, that before August 31, 1836, one Edwin M. Chaffee, of the state of Massachusetts, became and was the first and original inventor of a new and useful improvement in the process and machinery for the manufacture of India rubber, for which, he, the said Chaffee, on August 31, obtained a patent by which there was granted and secured to him, for the term of fourteen years from that date, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used the said improvement so invented by and so patented to him. That he, the said Chaffee, previous to August 31, 1850, made application to the commissioner of patents for an extension of said patent, for the term of seven years from the last mentioned day, which was granted to him, and that said extension inured to his sole and exclusive benefit. That in the year 1845, Charles Goodyear, by some contract, lien, or assignment, claimed to have become the owner of said patent so granted to the said Chaffee in the year 1836, and that before the extension thereof, and before the same was extended, in 1850, he conveyed the same, by license or sale, to a combination of individuals, among whom were the defendants. That since the extension of the original patent, the defendants have had no right, title, or interest in said extended patent, and no license or permission from the said Chaffee to use the improvement or invention so patented and secured to said Chaffee, for the extended term of seven years from August 31, 1850. That the defendants, since the last mentioned date, and since the term for which the original patent was granted has expired, and since the same was extended, have been using the improvement and invention of the said Chaffee, so patented to him, without any license or permission from the said Chaffee, or from any one having right to give such license or permission. That the said Chaffee, on July 1, 1853, by his deed of assignment of that date, in writing, duly executed and recorded in the patent office, for a valuable consideration to him paid, did assign, transfer, and convey to the complainant all his, the said Chaffee's, title to said invention and said patent for said extended term of seven years; and that the defendants are using said invention so patented, without any license or permission, and persist in so using the same, though called upon to desist. In the bill the complainant claims and prays, upon the aforesaid facts therein stated, that this court would grant a writ of injunction, directed to the defendants, commanding and enjoining them, and each of them, not to manufacture India rubber by any of the processes or machinery as patented to the said Chaffee in the said letters patent. There is no allegation in the bill that the defendants had no right to use the improvement patented to the said Chaffee, during the continuance of the original patent. It is substantially admitted, that up to August 31, 1850, they had such right so to use the same; that up to that time, they were duly licensed, by the person or persons in whom the right secured by the patent was vested, to use the same. But the complaint is, that since the expiration of the original patent, and since the same was extended, they had no such right, either in law or in equity. That from the time the patent was extended to July 1, 1853, when the rights which the said Chaffee then had to the said extended patent were transferred and assigned to the complainant, they were not licensed or otherwise authorized to use the improvements secured by the extended patent, either by the said Chaffee, or by any one acting under his authority, and that since the transfer of the right which the said Chaffee had in the extended patent to the complainant, they have not been authorized to use the same in any way, either by the complainant, or by any one acting under his authority. And that during the whole of the period from the time the patent was extended, they have been using the thing or process secured to Chaffee and his assigns, by the extended patent, without right or excuse, contrary to the mind and will of the said Chaffee, up to the time of the assignment of the extended patent to the complainant, and contrary to the mind and will of the complainant since that time.

The bill, therefore, upon the face of it, shows a good cause of complaint. Upon the face of it, there is shown, on the part of the complainant, a right to demand equitable relief. And the allegations contained therein, if true, would authorize the court, and make it their duty, to grant the injunction as prayed for. The question, therefore, to be determined is, are these allegations, thus

set forth in the bill, true? The defendants admit that a portion of these allegations are true. But they claim that another portion of them, and a material portion of them, are not true. They admit that Chaffee was the original inventor of the improvement patented—that it is a useful improvement —that on August 31, 1836, he obtained a patent for the same, by which the exclusive right to such improvement was secured to him for the term of fourteen years —that he afterward obtained an extended patent for seven years, from August 31, 1850, and that said extended patent was a valid one. They admit that during the existence of the original patent, Charles Goodyear, by assignment, became the owner of such original patent, and that up to August 31, 1850, they used the improvement patented, under him and by his license and authority. They admit that since August 31, 1850, they have been using the improvement patented, and that they are now using the same, and that the right which Chaffee had in the extended patent on July 1, 1853, if he had any, was on that day assigned to the complainant. But they deny that since the expiration of the original patent, and since the same was extended, they "have had no right, title, or interest in said extended patent, and no license or permission" to use the same. They claim that ever since said patent was extended, they have had a right to use the same, and now have such right. That for all that period they have had, and now have, not only an equitable right, but a legal right to use the same. And this question of right must be determined upon the proofs which have been exhibited on the hearing of the motion.

When the motion for a preliminary injunction was filed, and before any affidavits had been taken, it was conceded by the complainant's counsel, that the rights of the complainant, as against the defendants, were only such as the said Chaffee's would have been, if the assignment by Chaffee to the complainant had not been made; and that no greater success ought to attend the complainant's application than would have attended an application on the part of Chaffee, had not that assignment been made, and the case had been presented by him, Chaffee, asking relief in his behalf. And without such concession, such, upon the evidence, would be the rule to be adopted. Indeed, the complainant's bill is framed upon the ground that he is entitled to that which Chaffee would have been entitled to, had he not made the assignment, and to that only. For it seeks not only to enjoin the defendants against using the invention patented, but to recover the damages, which the complainant says, before the assignment, Chaffee was entitled to, by the use made by the defendants of the improvement patented before that time. The case, therefore, upon this motion for a preliminary injunction, will be considered as it would have been considered if no assignment had been made by Chaffee to the complainant, and he, Chaffee, was the party filing the bill.

That we may more perfectly understand the import of the agreement upon which the defendants rely for the right which they claim to have to use the improvement patented, and the transactions which took place at the time when that agreement was entered into, and subsequent thereto, it is necessary to notice some previous contracts and matters to which Goodyear, Chaffee, and the defendants were immediate parties, or in which they were interested.

After the original patent of August 31, 1836, had been granted to Chaffee, he, by an instrument under his hand and seal, and dated December 8, of the same year, transferred all his right to that patent, to the Roxbury India Rubber Company, a corporation established by the laws of the state of Massachusetts, and subsequent to that transfer, and during the existence of that patent, by various assignments through intermediate parties, the right to that patent, and the whole right to the same, became, and was vested in Charles Goodyear. While Goodyear was the owner of that patent, and while he was the owner of other India-rubber patents, which he had either as original inventor or as assignee, there was, on July 1, 1848, a contract and agreement entered into between him of the first part, and Leverett Candee as the general partner in a special partnership located at New Haven, and doing business under the name and firm of Leverett Candee, the Hayward Rubber Company, the Newark India Rubber Manufacturing Company, and Ford & Company, by which, in consideration of certain payments then made, and certain other payments to be thereafter made by the said parties of the second part, to the said party of the first part, the said party of the first part sold and assigned to them the sole and exclusive right to use all his preparations of India rubber, and all his improvements in the preparation and use of India rubber in the manufacture of boots and shoes of all kinds, and all right or interest which he then had to the same, or which at any time thereafter he should have, either as inventor or assignee, or by virtue of any contract, embracing all preparations of India rubber, whether then known and patented or to be thereafter known or patented, and all benefits and advantages covenanted or in any way secured, or to be secured, under any license or agreement, for the use of such improvements in the manufacture of boots and shoes; by which the defendants and their associates obtained a beneficial interest in the patent granted to the said Chaffee by his letters patent dated August 31, 1836, a beneficial interest in any contract in relation to any extended patent which Goodyear might thereafter make with the said Chaffee.

While the defendant had such beneficial interest in the patent issued August 31, 1836, and a short time before it expired, to wit: on May 23, 1850, there was a contract, in writing, entered into between Goodyear and Chaffee, by which Chaffee sold and assigned to Goodyear all the right and title to an improvement or invention which he, Chaffee, claimed, and which had not then been patented, for compounding and mixing gum lac or shellac with India rubber, either with or without sulphur or other ingredient and heat, and agreed to apply with, or in behalf of, Goodyear for a patent for the same at the expense of Goodyear. It was agreed by said contract, that Goodyear might take out patents for the same in all foreign countries for his, Goodyear's, benefit, he, Goodyear, paying the expenses of the same. It was agreed further by Chaffee, upon the issuing of an extended patent for that which had been patented, to wit: by the patent of August 31, 1836, or a patent for his invention for compounding and mixing gum lac or shellac with India rubber, either with or without sulphur or other ingredient and heat, that he would immediately assign them to Goodyear. And it was agreed by Goodyear to pay Chaffee three thousand dollars, one-half, to wit: fifteen hundred dollars to be paid at the time of the issuing of the patent for compounding and mixing gum lac or shellac, in the United States, if it should be issued, or if a renewed patent, in extension of the letters patent issued August 31, 1836, should first be granted, then the aforesaid sum of fifteen hundred dollars should be paid to Chaffee upon the assignment of said extended patent by Chaffee, and the remaining sum of fifteen hundred dollars in one year from the date of said contract. And it was further agreed by said contract, that in case Goodyear should not pay the sums agreed to be paid by him at the times when they were payable, that he would make such lien, transfer, or conveyance of his right, title, and interest in said patents to Chaffee as should prevent any valid transfer of any rights or interests in said patents by him, until said payments were made. And by said contract, the right was reserved to Chaffee, notwithstanding the assignment, which was, by the terms of the contract to be made, to use the extended patent in any business which he might carry on. By this contract, he, Chaffee, did all he could to give to and invest in Goodyear all his right to the new improvement or invention of compounding and mixing gum lac or shellac with India rubber, and to an extended patent of the patent of August 31, 1836, which might be granted. He had a right to convey in his new improvement and invention—he, therefore, conveyed that right. He had no right to convey in any extended patent; for no such right to such extended patent was then vested in him. He did, however, all that he could. He agreed, upon a valuable consideration, to convey such right whenever it should be vested in him; reserving to himself only the privilege to use the right which might be given by an extended patent, in any business which he might carry on. The whole right, reserving this privilege, was to be conveyed to Goodyear. Goodyear was to be at the expense of obtaining a new patent, but there was no obligation on the part of Goodyear, by the contract, to be at any of the expense in obtaining the extended patent. There is no proof that any patent was ever granted for the improvement of compounding and mixing gum lac, shellac, with India rubber, or that any application was made for one. But an application was made for an extended patent for the India-rubber machinery, and the same was granted.

There was then nothing by the terms of this contract to be paid by Goodyear to Chaffee, until the assignment of said extended patent by Chaffee to him. When it should be assigned, then fifteen hundred dollars was to be paid. Without an assignment, or that which Goodyear should receive in lieu thereof, nothing was to be paid. He was to pay the fifteen hundred dollars upon the execution of an assignment, and not before, and not upon the execution of a power authorizing some one to make it. By this contract there was an absolute obligation on the part of Chaffee to assign and convey the extended patent to Goodyear; he was bound, in law, to convey, and nothing would, in law, absolve him from this obligation but the neglect or refusal of Goodyear to pay the fifteen hundred dollars which was to be paid when the assignment was to be made, or the refusal of Goodyear to make the lien as was by the contract agreed, or some other act on the part of Goodyear to excuse or discharge him, Chaffee, from this obligation. And the contract, when it should be performed by Chaffee, was, by virtue of the agreement entered into on July 1, 1848, between Goodyear and the defendants and their associates, to inure to their benefit. The terms of this contract should be particularly borne in mind in considering this case. And it should be borne in mind, too, when such assignment should be made to Goodyear, or to any one in trust for him, that such assignment would inure to the benefit of the defendants. They had paid their money that it should so inure. Immediately after this contract was entered into, Chaffee, with a view to faithfully carry out the provisions therein contained, went to Washington to obtain an extended patent. William Judson, the general attorney to Goodyear, also went, to further the object which both parties had in view, to obtain such extension. The application for an extension had to be in the name of Chaffee, and Judson was his agent in furthering that application. An extended patent for seven years was granted, bearing date August

31, 1850, and on September 5 of the same year, an agreement by Chaffee and Judson as the nominal parties, was entered into, upon which the defendants principally rely for the right which they claim to use the thing secured by the extended patent in the way they are using it.

That agreement, which was signed by Chaffee, and by him alone, but which was, on the day it bears date, delivered to Judson, after reciting that Chaffee had procured an extension of his patent, dated August 31, 1850, for seven years from the last-mentioned day—that the expenses for procuring the extension had been large, and could not then be ascertained—that when it was extended, it stood in the name of Charles Goodyear, for the benefit of certain licensees; that Charles Goodyear, for himself and others, the licensees, had agreed to be at the expense of obtaining the extended patent, and to make him, Chaffee, an allowance for the use thereof, at the rate of twelve hundred dollars a year; that William Judson had had the management of the application for the extension, and had paid and agreed to pay the expenses thereof, and had agreed to guarantee to him, Chaffee, the payment of said annual sums, stipulated that he, Chaffee, did, in consideration thereof and for these reasons, and in order that the extended patent might inure to the benefit of the said Charles Goodyear and these defendants, and the other licensees under the original patent, appoint William Judson his trustee and attorney, irrevocable, to hold said extended patent, and have the control thereof, so that no one should have a right to use the same except those who had a right to use the original patent, without the written consent of Judson first had and obtained. And by that contract, Judson, for himself and those interested, to wit: Goodyear and the other licensees, agreed to be at all the expense of obtaining the extended patent, without charge to him, Chaffee, and to pay him the said annual sums. And the expense of sustaining and defending the patent was to be borne by Judson and those for whom he professed to act, to wit: Goodyear and the other licensees. And, by that contract, Chaffee reserved to himself the right to use the patent in any business which he might carry on. And there was no other right to the patent, in him, by express agreement reserved. And the great question is, what is the construction to be put upon this contract which the defendants say gives them the right to use the extended patent in the way they are and have been using it?

Contemporaneous with this contract, or within a few days thereafter, there was paid to Chaffee, by the defendants and their associates, who, with them, entered into the contract with Goodyear, of July 1, 1848, above recited, the sum of fifteen hundred dollars. There is no proof that there was any written agreement by which the sum of fifteen hundred dollars was to be paid to Chaffee at one time, by Goodyear, or by the defendants and their associates, licensees under Goodyear, except the written agreement entered into between Goodyear and Chaffee on May 23, 1853, and by that agreement such payment was to be made only upon the assignment of the extended patent by Chaffee, reserving to himself, notwithstanding such assignment, the right to use the same in any business which he might carry on. The defendants claim that by virtue of the contract of September 5, 1850, they had a right to use the patent in the way they are using it. They rest their claim on two grounds: First. They claim that by that contract Chaffee was divested of all legal title to the patent; that the legal title was transferred to Judson for himself, and in trust for the use and benefit of the defendants and the other licensees under Goodyear. Secondly. They claim if Chaffee by that contract was not divested of the strict legal title to the extended patent, that by virtue thereof they acquired a beneficial, vested, equitable interest in the same, and which beneficial, vested, equitable interest they now retain, and of which they can not be deprived by any act of Chaffee. And that the act of Chaffee of the date of July 1, 1853, by which he attempts to "annul, cancel, and render void and of no effect" the said contract of September 5, 1850, should have no effect upon their rights thus vested in them.

The complainant claims that the said contract of September 5, 1850, was no legal transfer of any legal right in the patent to Judson; that it was no equitable transfer of any beneficial, vested, equitable interest in the same to the defendants; that it was a mere power of attorney, not coupled with any interest that could deprive Chaffee of the right at any time to revoke it; and that having that right, he did, on July 1, 1853, revoke it. That there was a large debt due from Chaffee to Judson, for expenses which he had paid and which he had agreed to pay, and which had otherwise accrued, and that the object of the contract was merely to enable and empower Judson to collect that debt by granting licenses to the defendants and to the other contracting parties in the contract with Goodyear, of July 1, 1848, upon their paying, as a condition precedent for such licenses, their respective portions of such debt, and to enable Judson to put a "veto" upon any licenses which Chaffee might grant to any other persons. And particularly, he claims that this should be the construction of this contract when taken in connection with an agreement made by and between Judson and Chaffee, on November 12, 1851, and to be hereafter noticed. This contract of September 5, 1850, is something more than a mere power of attorney, as claimed by the complainant, revocable at his pleasure by any act done by

him during his life, or by his death. I do not decide the question whether or not, by this contract, the strict legal title in this extended patent was transferred by Chaffee to Judson. The necessities of the case do not require that it should be decided. For if these defendants, by this contract, are vested with an equitable right to use the patent (if, in good conscience they are entitled to use it), as the complainant has come into this court asking for equity, and by so doing is bound not only to do equity, but permit the defendants to avail themselves of their equitable rights, if they have such equitable rights, they are to be protected in the enjoyment of them, notwithstanding the strict legal title to the patent may be vested in him, the complainant.

To the question then, what is the equitable construction of this contract? To determine this, we must ascertain, if we can, what was the intention of Chaffee when he executed it. The complainant, as has been already stated, claims that it was a mere power of attorney, for certain purposes, and not coupled with any interest, and therefore, revocable by Chaffee. If it was a power, and if it was coupled with an interest, then Chaffee could not revoke it; and no one claiming under Chaffee could revoke it. The law, on the subject of what powers are revocable and what are irrevocable, what are powers coupled with an interest and what are not, is well laid down in the case of Hunt v. Rousemanier's Adm'rs, 8 Wheat. [21 U. S.] 174, and as it is there laid down will not be questioned.

The bill in that case stated that Rousemanier, the intestate of the defendants, applied to the plaintiff for the loan of fourteen hundred and fifty dollars, offering to give, in addition to his notes, a bill of sale, or a mortgage of his interest in the ship Nereus, then at sea, as collateral security. The money was lent and the notes were executed for the same. Neither the bill of sale nor mortgage was given. A few days after the notes were executed, Rousemanier executed a power of attorney authorizing the plaintiff to make and execute a bill of sale of three-quarters of the vessel to himself, or to any other person; and in the event of the said vessel, or her freight, being lost, to collect the money which should become due on a policy by which the vessel and freight were insured. The instrument also contained a proviso, that the power was given as a collateral security for the payment of the notes, and was to be void on their payment. The notes were not paid, and Rousemanier died. Chief Justice Marshall, in giving the opinion of the court in that case, says: "This instrument contains no words of conveyance or assignment, but is a simple power of attorney. As the power of one man to act for another depends on the will and license of that other, the power ceases when this will or this permission is withdrawn. The general rule, therefore, is, that a letter of attorney may at any time be re-voked by the party who makes it, and is revoked by his death. But this general rule, which results from the nature of the act, has sustained some modifications. When a letter of attorney forms a part of the contract, and is a security for money, or for the performance of any act which is valuable, it is generally made irrevocable in terms, or, if not so, is deemed irrevocable in law. Although a letter of attorney depends from its nature on the will of the person making it, and may, in general, be recalled by his will, yet, if he binds himself for a consideration in terms, or by the nature of his contract, not to change his will, the law will not permit him to change it. Rousemanier could not, therefore, during his life, by any act of his own, have revoked this letter of attorney. If a power is coupled with an interest, it survives the person giving it, and may be executed after his death. A power coupled with an interest, is an interest in the subject on which the power is to be exercised, and not merely an interest in that which is produced by the power."

Let, then, the contract now under consideration be tested by the law, as laid down by Chief Justice Marshall. In the contract of September 5, 1850, in consideration of the sum of fifteen hundred dollars paid to Chaffee by the defendants and their associates, the licensees under Goodyear, or by Judson for them, at the time of the execution thereof, or within a few days thereafter, and in consideration that Judson had paid and had become liable to pay all the expenses of procuring the extended patent, which, as expressed in the contract, had been large, and which, if we are to credit the statements of the complainant's counsel as made in the argument, amounted to many thousand dollars, and in consideration that he, Chaffee, should be at no charge for these expenses, that he should be free from such charge, and for the other considerations named in the agreement, the contract, such as it was, was entered into. And the object, on the face of it, was and is so expressed to be, to place the patent so that it may inure to the benefit of Goodyear and the licensees, and continue in the condition in which, by the contract, it was placed, unaffected by his, Chaffee's, "death or other event." For this consideration which he receives, and which Judson and these defendants and others paid, he binds himself in terms that the condition in which by that contract the patent was placed, should not be altered by his death or by any event. His will was, for the consideration which he received, that the patent should be placed in the condition in which the contract placed it; and he bound himself "not to change that will." Then what does Chief Justice Marshall say to a case thus circumstanced? He says, in the case in Wheaton already referred to: "Although a letter of attorney may, in general, be revoked by the will of the party executing it, yet, if he binds himself

for a consideration, in terms, or by the nature of his contract, not to change his will, the law will not permit him to change it. He can not, therefore, during his life, by any act of his own, revoke it." From this agreement of September 5, 1850, it would appear that it was the intention of the parties that after the same was executed there should be no debt or claim, or "charge," in favor of Judson, for any of the expenses which had accrued in obtaining an extension of the patent against Chaffee; but that Judson should pay the same and that Chaffee should be free therefrom. The contract is express on the part of Judson, "that the expenses of extending said patent shall all be paid without charge" to Chaffee. That Judson had paid and become liable to pay the expenses thereof. That Judson should pay the whole of them, and that there should be no "charge" to Chaffee for what he had paid, or for what he should pay. That so far as they had been ascertained, they had been paid by Judson, and that that portion of them which had not been ascertained should be paid by him.

If, then, the understanding of the parties was that there should be no "charge" in favor of Judson against Chaffee for any of the expenses in obtaining the extended patent, but that he, Judson, should pay the whole, then it follows, as there was no "charge" in favor of Judson against Chaffee to be secured, that the object of the contract was something else than according to the claim of the complainant, to enable and empower Judson to collect a debt or "charge" in favor of Judson against Chaffee, by granting licenses to the defendants, and to the other contracting parties in the contract with Goodyear of the date of July 1, 1848, upon their paying as a condition precedent for such licenses, their respective portions of such debt or "charge," and to enable Judson to put a "veto" upon any licenses which Chaffee might grant to any other persons. The complainant admits that by the contract of September 5, 1850, there was to be a "veto" power in Judson upon any licenses which Chaffee might grant to any persons other than the defendants and their associates, contracting parties with Goodyear. And if this "veto" power did exist in him, then it follows that the instrument of September 5, 1850, call it by what name you may, was something more than a simple power of attorney, coupled with no interest made for the purpose, as claimed by the complainant. For such a "veto" power could not exist in a mere power of attorney, "coupled with no interest." If it was merely such power of attorney, Chaffee would still have had a right to grant as many licenses as he pleased without the consent of Judson.

The great object of a court of equity is, in construing a contract, to ascertain the intention of the parties to it. In the contract of May 23, 1850, between Goodyear and Chaffee, the intent of the parties is clear, that Chaffee, if an extended patent should be obtained, was to assign the same to Goodyear, reserving the right to use the same in any business which he might carry on, upon the payment by Goodyear to Chaffee of the sum of fifteen hundred dollars upon the assignment of the same, and upon his, Goodyear's, agreement to pay the further sum of fifteen hundred dollars in one year from the date of said agreement, he, Goodyear, agreeing further to secure Chaffee such payment by a lien on the patent. All that Chaffee was to receive was three thousand dollars; and Goodyear was to have the whole right to the patent, Chaffee reserving a right only to use it in his business. This was the contract. And the patent, when so assigned, was, by virtue of an agreement between Goodyear and the defendants and their associates, to inure to them. Goodyear never refused or neglected to perform his part of the agreement. Chaffee pretends that he did. Chaffee says that he, Goodyear, refused to perform what he had agreed to perform, and that was the reason why he did not convey to Goodyear, as he had agreed that he would. Goodyear was to pay nothing until the assignment was made, and then he was to pay fifteen hundred dollars. And the fair construction of the contract of September 5, 1850, is that by it he, Chaffee, agreed in substance to do what he had agreed to do by the contract with Goodyear of May 23, 1850; though by the contract of May 23 he was to receive as a consideration only three thousand dollars, while by the contract of September 5 he was to receive as a consideration a much larger sum. By the contract of May 23 he agreed to assign the whole patent to Goodyear, reserving to himself only the right to use the same in any business which he might carry on. By the contract of September 5, he agrees, upon a valuable consideration paid, to place his patent so that in case of his death, or in any event, it might inure to the benefit of Goodyear, and those who had a right to the use of the patent under and in connection with his licensees, reserving to himself the right, as was reserved in the contract of May 23, to use the same in any business which he might carry on. And in order to carry out this agreement more effectually, he appoints Judson his attorney and trustee, irrevocable, to hold said patent and have the control thereof, so that it might thus inure, as he had agreed, upon a valuable consideration paid, it should inure. He was paid a valuable consideration that it might so inure, and he agreed for that valuable consideration paid, that it should so inure. For that valuable consideration paid, and for a further sum agreed to be paid, and for other considerations, he agreed with Judson that the whole patent should inure for the benefit of others, reserving only the right to use it himself in his business. It was to inure to them during the existence of the patent, so as not to be affected by any subsequent act of his, or by his death, or by any other event. And it could not so inure unless either a legal

or an equitable right to the patent was transferred. Therefore, as Chaffee intended that it should so inure, and as it could not so inure unless either a legal or an equitable right was transferred, he intended by that contract that either a legal or equitable right to it should be transferred, and, as that was his intention, he agreed that such right should be so transferred.

Where one, having a right, for a valuable consideration paid, agrees with another person that that other person shall have the enjoyment of that right, and gives a power of attorney to enable such other person to possess and enforce that right, he who makes such agreement and gives such power of attorney, shall not by law be permitted to revoke that power so as to deprive the other party of the right, which, for such valuable consideration, the party making the power had agreed that the other party should have and enjoy. It is not necessary that there should be a formal assignment of the right. If there is an agreement, upon a valuable consideration paid, that the party should have the benefit of the right—that it should inure to him, and for that purpose a power of attorney is executed, that is, at least in a court of equity, equivalent to a formal assignment. In such a case, the power of attorney is a power coupled with an interest, not merely in the execution of the power; not merely an interest in that which is produced by the power, but in the thing itself. Raymond v. Squire, 11 Johns. 47. If the obligee in a bond for the payment of a sum of money, agrees with a third person, upon a valuable consideration paid, say the amount in the bond named, that that bond should inure to the benefit of such third person, and should give a power of attorney to such third person in order that he might have the control of such bond, to hold the same, and he to be at all the expense of a suit upon the bond, without charge to the obligee, it would not be in the power of the obligee in such bond, by any act of his, to deprive such third person of the benefit of such bond which he had agreed should inure to such third person. And it makes no difference whether the subject on which the contract is to operate, for the benefit of one of the parties in interest, be a bond or a patent. The provision in the contract of September 5, that "Judson and those for whom he acts, are to be at all the expense of sustaining and defending the patent, without any charge to" him, Chaffee, shows that it was the intention of the contracting parties that Judson, and those for whom he was acting, were to have an irrevocable interest in the subject they were contracting about. For why should they be at such expense, unless they had an interest to be secured by subjecting themselves to such expense? And the further provision, expressly made, that Chaffee was to "have the right to use the patent and improvement in any business which he might carry on," tends strongly to show, that

without such provision, that the parties supposed he would, after the contract should be executed, have no such right.

It is claimed by the complainant, that this contract of September 5, was modified, altered, and explained by a subsequent agreement, made by and between Judson and Chaffee, on November 12, 1851, and that when taken in connection with the latter agreement, the construction of it should be different from that which has been given to it. These defendants never gave their consent to the agreement of November 12. They never authorized it. They knew nothing of it at the time. They never ratified it. They knew nothing of it until a very recent period. They do not now claim under it. And if they had rights secured to them by the contract of September 5, 1850, and by the consideration which they paid for that contract, those rights are not to be affected by any subsequent agreement between Judson and Chaffee, to which they have never given their consent.

But suppose that the contract of September 5, 1850, and the defendants' right under that contract were to be affected by the agreement of November 12, the question then would be, should a different construction be given to the contract of September 5, when considered in connection with the agreement of November 12, than that which has been given to it, considered separately. Although only twelve hundred dollars was the sum which, by the contract of the said September 5, was, by the terms of it, to be annually paid to Chaffee, in quarterly payments, yet from the date of that contract up to November 12, 1851, the sum of fifteen hundred dollars had been the annual payment which had actually been made—and in looking at the agreement of November 12, the parties to it appear to have had two objects in view. One was, to reduce to writing what had been tacitly acquiesced in without such writing, that the annual payment to Chaffee should be fifteen hundred dollars, instead of twelve hundred dollars. And the other was to enable Judson to compel the defendants and their associates, the contracting parties with Goodyear in the contract of July 1, 1848, to pay their respective portions of the expenses of obtaining the extended patent in case they, or either of them, should refuse to pay, by withholding from them their licenses. And if I am right in the view heretofore taken of the contract of the said September 5, that after such contract Judson had no "charge," and could have no "charge" against Chaffee for any expenses which he had paid, or which he might pay, and which he was bound to pay in obtaining the extension, then Chaffee had no interest in this latter provision, and the above-named object was its only object. In this view of the case, it was made for the sole benefit of Judson. Chaffee had no interest in it. He had an interest that there

should be no "charge" against him for any portion of those expenses. That interest was secured by the said contract of September 5. By that contract Judson was to have no "charge" against him for any portion of such expenses, and as Judson had no "charge" against him for those expenses, he had no interest in having the expenses paid by the defendants and their associates to Judson. By such payment he was not the gainer. By the non-payment he was not the loser. The provision was exclusively for the benefit of Judson. It being for his exclusive benefit, it could be waived by him; and Chaffee could not complain if it was so waived.

I do not deem it necessary, therefore, to go into an examination of the question of fact whether or not the defendants paid to Judson their portion of these expenses. Much testimony by way of affidavit has been taken on this subject. The complainant claims thay did not pay Judson. The defendants claim that they did. But whether they did or did not, Chaffee has no cause of complaint. And if they were not paid by the defendants to Judson, and Judson had any cause of complaint, he had waived it.

There is one additional provision in this agreement of November 12, 1851, which shows that the construction put upon the contract of September 5, 1850, is the correct one. It is that Judson may use his, Chaffee's, name in the prosecution of all suits for the recovery of damages, for any infringement of the patent, and have all the benefits which may be derived from such suits. If the benefits by way of damages for an infringement of the patent were one hundred thousand dollars, Judson was to have the whole, and Chaffee was to have no portion of them. It is difficult for me to conceive why such a provision should have been made, unless the parties supposed that Chaffee had been divested of all right in equity to the patent, except the right to use it in the business which he might carry on.

The complainant further claims, that the instrument in writing executed by Chaffee on September 5, 1850, was upon the condition that the contract, for the annual payments to be made to him quarterly, should be kept and performed according to the terms of that instrument; that such annual payments were not regularly made: that Judson and those for whom he acted when that instrument of September 5 was entered into, neglected and refused to make such annual payments; that they were in default in this respect; that being in such default, he, the said Chaffee, had a right to revoke the instrument so executed by him; that having such right, he did so revoke it, by a notice in writing to Judson of the date of July 1, 1853. This latter claim is not strenuously urged; but as it has been urged, it becomes necessary to notice it. The an-

nual payments of fifteen hundred dollars a year, to be made punctually up to December 1, 1852. It has been claimed by the defendants, that Chaffee has, in fact, received all that he was entitled to receive by virtue of the contract of September 5. But for the purposes of this case, I assume that the quarterly payments to be made were not made subsequent to December 1, 1852, and that he has not received of such payments all that he is entitled to. When the payment which was to have been made on March 1, 1853, became due, for certain reasons, the same was not made; and the payment that was due on June 1, 1853, for certain reasons, was not made. On June 23, 1853, Judson wrote Chaffee, in which letter, after stating the reasons which prompted him to withhold temporarily the quarterly payments which had become payable, he authorized Chaffee to draw on him at sight for such quarterly payments then due. And after that letter was written, and this authority to draw was given, the said Chaffee, on July 1, 1853, undertook, by a notice in writing to Judson, to "revoke, annul, cancel, and render void and of no effect," the instrument executed by him on September 5, 1850, and on the same day assigned all the right which he had to the patent to the complainant. I do not think that this claim of the complainant can be sustained. If I am right in the construction given to the contract of September 5, that by it a beneficial, equitable interest in the patent was vested in Judson and the defendants, then it would seem to follow that they could not be divested in equity of that beneficial, equitable interest, by the temporary withholding as above stated, of the quarterly payments. But it is not necessary to enlarge upon this part of the case, as this claim has not been strenuously urged. The actual payment at the precise time appointed, of these quarterly sums, was no part of the consideration upon which Chaffee agreed as he did agree by that contract. The agreement to pay them was part of the consideration, and not the actual payment at the time appointed. Chaffee relied for what he did upon an agreement to pay, and a failure to pay at the precise time would not authorize Chaffee to revoke the contract, and thereby to divest Judson and the defendants of the equitable interest, which, by the contract of September 5, they had acquired.

Other considerations have been pressed upon the attention of the court, sustained by numerous affidavits, to show that the defendants have now the right to use the patent, in the way they are using it. But, after the view which has been taken of the case, it is not deemed necessary to go into a thorough examination of them. And in disposing of this motion, I do not undertake to decide what are the strict legal rights of the parties; nor do I undertake to

say that the equitable rights of the parties, upon a more full hearing—upon a more thorough examination, when proofs to be used upon the final trial are taken, can not be made to appear different from what they now appear upon the hearing of this motion. All that I decide is, that upon this motion, the right on the part of the complainant and the violation of right on the part of the defendants, do not appear so clear, plain, palpable, manifest, as to authorize a court to grant an injunction against the defendants to prohibit them from any further using the patent, the rights to which are in controversy. The view I have taken of the case admonishes me, that by granting an injunction there would be a greater probability of producing incalculable mischief than there would be of preventing it; and that neither an absolute nor conditional injunction ought to be granted. The motion, therefore, is denied.

[NOTE. For other cases involving this patent, see note to Day v. Union India-Rubber Co., Case No. 3,691.]